| | |
|---|---|
| **STATE OF INDIANA**<br>COURT<br><br>**COUNTY OF SAINT JOSEPH** | SS:   IN THE SAINT JOSEPH SUPERIOR<br><br>CIVIL DIVISION |

PAULA KELLEY

       Plaintiff,

                   CAUSE NO. 71D05-1502-CT-000046

vs.

JANSSEN RESEARCH
& DEVELOPMENT, LLC,
f/k/a JOHNSON AND JOHNSON
PHARMACEUTICAL RESEARCH
AND DEVELOPMENT  LLC;
JANSSEN ORTHO, LLC;
JANSSEN PHARMACEUTICALS,
INC, f/k/a JANSSEN
PHARMACEUTICA INC, f/k/a
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC;
BAYER HEALTHCARE
PHARMACEUTICALS, INC;
BAYER PHARMA AG;
BAYER HEALTHCARE AG; and
BAYER AG;

and JOHN DOES 1-100,

       Defendants.              **AMENDED COMPLAINT**<br>                     **AND DEMAND FOR JURY TRIAL**

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

This is a civil action being brought by Plaintiff Paula Kelley, a private person,

against the captioned Defendants, jointly and severally, on the grounds and in the amount

as hereinafter set forth:

1.      Plaintiff has suffered damages as a result of Defendants' wrongful conduct in

connection with the development, design, testing, manufacture, distribution, and sale of

Xarelto®.  Plaintiff suffered damages as a direct result of her ingestion of Xarelto®.

2.      This action is brought on behalf of Plaintiff who used Xarelto®, also known as rivaroxaban, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis (hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

3.      Defendants, JANSSEN RESEARCH &  DEVELOPMENT LLC f/k/a JOHNSON    AND    JOHNSON    PHARMACEUTICAL    RESEARCH    AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN  PHARMACEUTICALS, INC. f/k/a JANSSEN  PHARMACEUTICA  INC. f/k/a ORTHO- MCNEIL-JANSSEN PHARMACEUTICALS, INC., BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER  PHARMA  AG,  BAYER  CORPORATION,  BAYER  HEALTHCARE  LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto®.

4.      When warning of safety and risks of Xarleto®, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiff, Plaintiff's treating physicians, and the public in general, that Xarelto® had been tested and was found to be safe and/or effective for its indicated use.

5.      Defendants concealed their knowledge of Xarelto's® defects, from Plaintiff, the FDA, the public in general and/or the medical community specifically.

6.      These representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto®  for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence  of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiff and other patients throughout the United States of America.

7.      Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto® during clinical trials, forcing Plaintiff, and Plaintiff-decedent's physicians, hospitals, and/or the FDA, to rely on safety information that applies to other  non-valvular  atrial fibrillation treatment and DVTIPE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto® whatsoever.

8.      As a result of the foregoing acts and omissions, the Plaintiff was and still is caused to suffer serious and dangerous side effects including inter alia life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences. Plaintiff has  sustained  certain of the above health consequences due to Plaintiff's ingestion and use of Xarelto®.

9.      Defendants concealed their knowledge of the defects in their products from the

Plaintiff, and Plaintiff's physicians, hospitals, pharmacists, the FDA, and the public in general.

10.     As a result of the inadequate development, design, testing, manufacture, distribution, and sale of Xarelto® sold by Defendants and ingested by Plaintiff, Plaintiff has suffered, and continues to suffer, serious bodily injury and has incurred, and may continue to incur, medical expenses to treat her injuries and condition.

## PARTIES

11.     Plaintiff Paula Kelley, at all times relevant hereto, was, and currently is, a resident and citizen of the State of Indiana and Saint Joseph County.  Plaintiff suffered damages as a direct result of her ingestion of the pharmaceutical product Xarelto®.  (Hereinafter the "Ingesting Plaintiff").

12.     Plaintiff anticipates joining other plaintiffs in this action because each of the plaintiffs' claims, named and un-named, are logically related to each other.  Plaintiffs' claims and rights to relief arise out of the same transactions and series of transactions including but not limited to the design, testing, manufacture, marketing, distribution and sale of Xarelto®.

13.     Defendant, JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL  RESEARCH AND DEVELOPMENT  LLC ("J&J") is a limited liability company organized, under the laws of New Jersey, with corporate headquarters located at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey, 08933. Defendant J&J is the holder of the approved New Drug Application ("NDA") for Xarelto® as well as the supplemental NDA.

14.     As part of its business, J&J is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto® and rivaroxaban.

15.     Upon information and belief, Defendant J&J has transacted and conducted business in the State of Indiana.

16.     Upon information and belief, Defendant J&J has derived substantial revenue from good and products used in the State of Indiana.

17.     Upon information and belief, Defendant J&J expected  or should  have expected its acts to have consequence within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

18.     Upon information and belief, and at all relevant times, Defendant J&J was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto® for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

19.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal  place  of business at  Stateroad 933  Km  0  1,  Street Statero,  Gurabo, Puerto Rico  00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson.

20.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto® and rivaroxaban.

21.     Upon information and belief, Defendant, JANSSEN ORTHO has transacted and conducted business in the State of Indiana.

22.     Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Indiana.

23.     Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

24.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto® for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE,  to  reduce  the risk  of recurrence of DVT  and/or PE,  and for prophylaxis  of DVT for patients undergoing hip and knee replacement surgery.

25.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

26.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto® and rivaroxaban.

27.     Upon information and belief, Defendant JANSSEN PHARM has transacted and conducted business in the State of Indiana.

28.     Upon information and belief, Defendant JANSSEN PHARM has derived substantial revenue from goods and products used in the State of Indiana.

29.     Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

30.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto® for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

31.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

32.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

33.     Upon information and belief, Schering AG was renamed Bayer Schering Phanna AG effective December 29, 2006.  Upon information and belief, Bayer Schering Pharma AG was then renamed  BAYER PHARMA AG effective July 1, 2011.

34.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto® and rivaroxaban.

35.     Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Indiana.

36.     Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Indiana.

37.     Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

38.     Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto® for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

39.     Defendant, BAYER HEALTHCARE PHARMACEUTICALS INC. ("Bayer Pharma") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 BAYER BLVD, WHIPPANY, NJ 07981. Bayer Pharma is the U.S.-based pharmaceuticals operation of Bayer HC, a division of Bayer. Bayer Pharma is a subsidiary of Bayer and jointly developed Xarelto® with J&J. At all times relevant and material hereto, Bayer Pharma was, and still is, a pharmaceutical company involved in the manufacturing, distribution, sale, and release for use to the general public of pharmaceuticals, including Xarelto® in Indiana, St. Joseph County, and throughout the United States.

40.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent holding company of BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMAAG.

41.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Indiana, and derived substantial revenue from interstate commerce.

42.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United

States of America, and in the State of Indiana, and derived substantial revenue from interstate commerce.

43.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

44.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany and the third largest pharmaceutical company in the world.

45.     Upon information and belief, and at all relevant times Defendant BAYER AG is the parent holding company of all other Bayer-named Defendants.

46.     Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Indiana, and derived substantial revenue from interstate commerce.

47.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, in the State of Indiana, and derived substantial revenue from interstate commerce.

48.     Upon information and belief,  at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto® for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence  of DVT and/or PE, and for prophylaxis  of DVT for patients undergoing hip and knee replacement surgery.

49.     Bayer's cooperating partner, Defendant J&J, submitted the new drug application to the FDA for Xarelto®.

50.     Together, each of the named defendants shall be referred to by name or jointly as the "Defendants."

51.     At all times alleged herein, Defendants shall include any and all named or un-named parent companies, parent corporations, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and any organizational units of any kind, their predecessors, successors, successors in interest, assignees, and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

52.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants herein.

53.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants thereby operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

54.     At all times relevant and material hereto, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and or introducing into interstate commerce throughout the United States, and in the state of Indiana, either directly or indirectly, through third-parties, subsidiaries and/or related entities, the anti-coagulant pharmaceutical Xarelto®.

## JURISDICTION AND VENUE

55.     Jurisdiction is proper over the Defendants based on Ind. R. Trial P. 4.4.

56.     This Court has jurisdiction over Defendants because each regularly conducts business, receives substantial revenues, markets and sells, and performs services in

Indiana.  At all times material and relevant hereto, Defendants were each involved in the

development of the pharmaceutical drug Xarelto® for distribution, sale, or intended use

throughout the United States, including Indiana and Saint Joseph County.   Accordingly,

Defendants each conducted business within the State of Indiana.  A substantial part of

Defendants' acts, omissions and events give rise to Plaintiff's personal injuries in this

County and the State of Indiana.

57.      This Court has personal jurisdiction over the Defendants pursuant to, and

consistent with, Indiana's long-arm statute (i.e., Ind. R. Trial P. 4.4) and both the State of

Indiana and Federal Constitutional requirements of Due Process in so far as that

Defendants, acting through agents or apparent agents, committed one or more of the

following:

58.      Defendants transacted, and continue to transact, business in Indiana, and

conducted, and regularly conducts business, receives substantial revenues, and sells and

performs services in Indiana and, Saint Joseph County; and

59.      Requiring Defendants to litigate this claim, and other claims arising for similar

circumstances, transactions or occurrences, in Saint Joseph County, Indiana, does not

offend traditional notions of fair play and substantial justice and is permitted by the

United States Constitution.

60.      Venue is proper in this County because pursuant to T.R. 75(A)(10), Defendants

regularly conduct business in Saint Joseph County, Plaintiff was prescribed and ingested

Xarelto® in Saint Joseph County, Plaintiff's injuries occurred in Saint Joseph County,

Plaintiff was medically treated for her injuries therein, Defendants marketed, distributed,

and sold Xarelto® in Saint Joseph County, and because all the Defendants are nonresident individuals or nonresident organizations without a principal office in the state.

61.     This is an action for damages, exclusive of interest and costs, which exceeds the sum of fifty thousand dollars ($50,000.00).

## NATURE OF THE CASE - GENERAL ALLEGATIONS

62.     Defendants, directly or by and through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Xarelto® as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis ("DVT"), to treat pulmonary embolisms ("PE"), and/or to reduce the risk of recurrence of DVT and or PE.

63.     Defendants applied for an initial NDA for Xarelto® in July of 2008.

64.     Xarelto® was approved by the Food and Drug Administration ("FDA") on July 1, 2011 reduces risk of blood clots, DVT, and PE following knee and hip replacement surgery.  On November 4, 2011 Xarelto was approved as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation.  On November 2, 2012 the FDA expanded to the of Xarelto to the treatment of patients with DVT and PE as well as long-term treatment to prevent recurrence of the same.

65.     According to the Defendants' marketing and informational materials, referenced in the paragraphs below, and widely disseminated to the consuming public, "Xarelto® is

the first and only once-a day prescription blood thinner for patients with AFib not caused

by a heart valve problem, that is proven to reduce the risk of stroke - without routine

blood monitoring."[1]

66.     As the Defendants state on their website, "XARELTO® has been proven to lower

the chance of having a stroke if you have atrial fibrillation (AFib), not caused by a heart

valve problem.   XARELTO® is an anticoagulant, or blood-thinning medicine that works

by helping to keep blood clots from forming." The Defendants further claim that "it's

been prescribed to more than seven million people around the world to help treat or

reduce their risk of dangerous clots" and that it "begins working a few hours after you

start taking it, and keeps working for as long as take it."[2]

67.     Defendants further declare that "XARELTO® is proven to help treat and prevent

DVT and PE blood clots" and that Xarelto® "reduc[es] the risk of these dangerous clots

[from] happening again."[3]

68.     Defendants claim that patients with AFib, DVT, or PE taking Xarelto® do not

need regular blood monitoring and there are no known dietary restrictions.   In addition,

patients with AFib only need to take Xarelto® once a day with an evening meal. [4]

69.     Defendants claim that patients with AFib are 5 times more likely than a person

without Afib to suffer from a stroke and that "disability is more likely to be severe" and

---

[1] Ihttp://www.fda.gov/downloadslDrugs/GuidanceComplianceRegulatoryInformationiEnforcement
ActivitiesbyFDAIWarningLettersandNoticeofViolationLetterstoPharmaceuticaiCompanies/UCM3
57833.pdf
[2] 2 http://www.xarelto-us.com/how-xarelto-works
[3] http://www.xarelto.comldvt-pe/treatment-of-dvt-pe
[4] http://www.xarelto-us.comldvt-pe/xarelto-difference#   and http://www.xarelto-us.com/how-
xarelto- is-different

"the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up." [5]

70.      Rivaroxaban is an oxazolidinone derivative optimized for inhibiting both free Factor Xa and Factor Xa bound in the prothrombinase complex.  It is a highly selective direct Factor Xa inhibitor with oral bioavailability and rapid onset of action. Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi.  Rivaroxaban does not inhibit thrombin (activated Factor II).

71.      Defendants routinely marketed  Xarelto® as a "one size fits all" drug; In their fervent marketing of Xarelto, Defendants' misinformed patients, and their healthcare providers, as to the necessity to routinely monitor any patient requiring a blood thinning agent.  In essence, the Defendants have created a new drug, Xarelto®, that is not better than warfarin from a safety perspective, and at best, perhaps slightly easier to use and administer.  The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but ignores patient safety.

72.      The Defendants' marketing materials suggest that Xarelto® represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

---

[5] http://www.xarelto-us.com/knowing-your-stroke-risk

73.     Defendants' boxed warning did not address the increased risk for serious and fatal bleeding, despite the fact that the information listed on their website originating from the Rocket AF clinical trial sponsored by Defendants  state that  in comparison  to warfarin, patients taking Xarelto® have more gastrointestinal bleeds and need more transfusions. In spite of this reference regarding bleeds, the information is still wholly inadequate because, this information was not conveyed in the boxed warning on the Xarelto® label. [6]

74.     According to Institute for Safe Medication Practices, QuarterWatch Report, issued on October 3, 2012, the primary reported adverse event related to Xarelto® use "was not the well- understood risk of hemorrhage.   Instead, the largest identifiable category was serious blood-clot- related injury-most frequently pulmonary embolism-the very events rivaroxaban is intended to prevent."   This lack of efficacy for short term users of Xarelto® post hip and knee replacement surgery resulted in about 44% of the reported adverse effects from taking Xarelto®.

75.     FDA clinical reviewers have stated that "rivaroxaban should not be approved unless the manufacturer conducts further studies to support the efficacy and safety of rivaroxaban" and the FDA website notes that "[a]dverse event reports of thrombocytopenia and venous thromboembolic events were identified" in relationship to Xarelto®".[7]  However, this information was not portrayed in the warning section on the warning label.   The lack of efficacy of the medication for patients taking Xarelto® post hip and knee surgery were not disclosed resulting in patients ingesting Xarelto® and

---

[6] http://www.xareltohcp.com/reducing-stroke-risklsafety.html

[7] http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/surveillance/ucm204091.htm

physicians prescribing Xarelto® without sufficient information to make an accurate decision.

76.     Defendants fervently marketed Xarelto® using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

77.     In the January/February 2013 issue of WebMD magazine, Defendants placed a print advertisement that resulted in the Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration  (FDA) to send an untitled letter stating that their print advertisement was "false or misleading because it minimizes the risks associated with Xarelto® and makes a misleading claim."   Furthermore, the advertisement states "there are no dosage adjustments" in conflict with the product labeling approved by the FDA. [8]

78.     As a result of Defendants' intense marketing, "[a]bout 130,000 U.S. prescriptions were written for Xarelto® in the first three months of 2012" resulting in large profits as Xarelto® costs approximately $3,000 a year versus $200 for generic warfarin. [9]

79.     As a result of Defendant's extreme marketing tactics, within the United Kingdom, Defendants also made 219 million Euros in sales from Xarelto®, more than three times as much as during the same period last year. [10]

---

[8] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Enforcement
ActivitiesbyFDNWarningLettersandNoticeofViolationLetterstoPharmaceuticaiCompanies/UCM357
833.pdf, June 6, 2013 FDA Untitled Warning Letter
[9] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood
Thinners" HujJpost Healthy Living.   14thJune 2012.
[10] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel"
http://www.reuters.comlarticle/20  13/09/08/us-bayer-xarelto- idUSBRE9870AH20 130908

80.     Due to the defective nature of Xarelto®, persons who were prescribed and

ingested Xarelto®, for even a brief period of time, including the Ingesting Plaintiff

herein, were at increased risk for developing life-threatening bleeds. Due to the flawed

formulation of Xarelto®, which according to Defendants does not require regular blood

monitoring or frequent doctor follow-up, raises concerns about the risk of stroke,

bleeding, and blood clots if not taken properly or absorbed properly, particularly in

patients with poor renal function. In addition, "[p]rominent U.S. [cardiologists and

health care professionals] stress that neither new drug [Xarelto] has a known antidote for

a bleeding emergency, as warfarin does."[11]

81.     Defendants' pharmaceutical Xarelto led to 968 suspected undesirable side-effects

including 72 cases of death in Germany in just the first eight months of 2013.[12]

82.     In addition, The Institute for Safe Medication Practices reported that:

> A clinical trial with 14,000 patients had shown that rivaroxaban was no
> worse than warfarin. [40] But reviewers noted that warfarin had not been
> optimally used. If rivaroxaban were really inferior to optimally used
> warfarin-but this was not proven, only suspected-its use could lead to
> increased death and injury. [41] Reviewers also questioned the convenient
> once-a-day dosing scheme, saying blood level studies had shown peaks
> and troughs that could be eliminated by twice-a-day dosing .... As with
> other anticoagulants, the rate of clinically relevant bleeding in clinical
> studies was high-15% per year of treatment. [13]

In other words, the insufficient testing conducted and the deadly consequences of

Xarelto® did not go unnoticed.

---

[11] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" Huffpost Healthy Living. 14thJune 2012.

[12] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/article/20 13/09/08/us-bayer-xarelto- idUSBRE9870AH20 130908

[13] Institute for Safe Medication Practices, QuarterWatch Report, October 3,2012

83.     Even more significantly, in the first quarter of 2012, The Institute for Safe Medication   Practices "identified 356 reports of serious, disabling, or fatal injury in which rivaroxaban was the primary suspect drug.  The report more than doubled from the previous quarter total of 128 cases."[14] However, when the findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed." [15]Defendants placed more value into ensuring that their profits would continue instead of working on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

84.     Defendants concealed their knowledge that Xarelto® can cause life threatening, irreversible bleeds from the Ingesting Plaintiff, other consumers, the general public, and the medical community.   Indeed, the Defendants did not properly warn of the irreversible nature of Xarelto® in the "Warnings and Precautions" section of the products warning label.   The only warnings provided by Defendants were as follows:

### *WARNINGS AND PRECAUTIONS*

- *Risk of bleeding:  XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)*

- *Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery.  Promptly evaluate signs and symptoms of blood loss. (5.7)*

- *Prosthetic heart valves:  XARELTO use not recommended. (5.8)*

---

[14] Id.

[15] Id.

Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto® usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

85.     As seen in the "Full Prescribing Information" provided by Defendants, Defendants reveal that they did not test for all the possible reversal agents for this dangerous since "[a] specific antidote for rivaroxaban is not available" and "[u]se of procoagulant  reversal agents such as prothrombin complex concentrate  (PCC), activated prothrombin complex concentrate (APCC), or recombinant factorVlla (rFVIIA) may be considered but has not been evaluated in clinical trials." However, this is buried in small print.

86.     Importantly, Xarelto® still does not have a "black box" warning informing patients or prescribing doctors know that Xarelto® can cause irreversible bleeds.  In fact, the August 2013 Highlights of Prescribing Information only has a "black box" warning stating the following:

| |
|---|
| *WARNING:  (A) PREMATURE DISCONTlNUATION OF XARELTO INCREASES THE RISK OF THROMBOTIC EVENTS. and (B)  SPINAL/EPIDURAL HEMATOMA See full prescribing information for complete box warning* |
| *PREMATURE DISCONTINUATION  Of XARELTO INCREASES  THE RISK OF THROMBOTIC EVENTS* |
| *Premature  discontinuation of any anticoagulant, including XARELTO, increases the risk of thrombotic events. To reduce this risk, consider coverage with another anticoagulant if* |

19

> *XARELTO is discontinued for a reason other than pathological bleeding or completion of a course of therapy (2.2. 2.6, 5.1. 14.1).*
>
> *SPINAL/EPIDURAL HEMATOMA*
>
> *Epidural or spinal hematomas have occurred in patients treated with XARELTO*
>
> *who are receiving neuraxial anesthesia or undergoing spinal puncture. These hematomas may result in long-term or permanent paralysis (5.2.5.3,6.2.),*
>
> *Monitor patients frequently for signs and syptoms of neurological impairment and it observed, treat urgently. Consider the benefits and risks before neuraxial intervention in patients who are or who need to be anticoagulated (5.3).*

87.    Even in the "Warnings and Precautions" section of the August 2013 Highlights of Prescribing Information, the irreversible nature of the medication Xarelto® was not revealed to patients or their prescribing doctors.  Defendants merely indicated that there was a risk for bleeding and side-stepped the important issue of reversing the effects of Xarelto® should a bleed occur as seen below:

### *WARNINGS AND PRECAUTIONS*

- *Risk of bleeding:  XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)*

- *Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery.  Promptly evaluate signs and symptoms of blood loss. (5.7)*

- *Prosthetic heart valves:  XARELTO use not recommended. (5.8)*

20

88.     Aside from the warning labels, Defendants did not issue a Dear Doctor letter that sufficiently outlined the dangers of administering Xarelto® to a patient.   In the September 2013 letter to healthcare professionals, Defendants do not mention the lack of an antidote in Xarelto® should serious and fatal bleeding occur while a patient was taking Xarelto®.

89.     The current warning is simply inadequate.  The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Ingesting Plaintiff herein.

90.     Even if the warnings were sufficient, which Ingesting Plaintiff strongly denies, Xarelto® still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug. Xarelto® is quite simply dangerous and defective as formulated. The Defendants should withdraw Xarelto® from the market.

91.     Defendants willfully, wantonly and with malice withheld the knowledge of increased risk of irreversible bleeds in users of Xarelto® to prevent any chances of their product's registrations being delayed or rejected by FDA.

92.     As the manufacturers and distributors of Xarelto®, Defendants knew or should have known that Xarelto® use was associated with irreversible bleeds.

93.     With the knowledge of the true relationship between use of Xarelto® and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Xarelto® as a safe and effective treatment for AFib.

21

94.    Defendants' "Xarelto® … is estimated to be the  19th-best-selling drug in the world by 2018, according to the report.   Worldwide sales of Xarelto® are expected to jump from $596 million in 2012 to $3.7 billion in 2018."[16]

95.    While Defendants enjoy great financial success from their expected blockbuster drug, Xarelto®, they continue to place American citizens at risk of severe bleeds and death.

96.    Consumers, including Ingesting Plaintiff, Paula Kelley, who have used Xarelto® to reduce the risk of stroke due to Afib or to reduce the risk of blood clots, DVT and PE following knee or hip replacement surgery, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits, associated with Xarelto® therapy.

97.    Defendants, through their affirmative misrepresentations and omissions, actively concealed from Ingesting Plaintiff and Ingesting Plaintiffs physicians the true and significant risks associated with Xarelto® use.

98.    As a result of Defendants' actions, Ingesting  Plaintiff Paula Kelley and Ingesting Plaintiff's physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Ingesting Plaintiff would be exposed to  the risks identified in this Complaint.  The increased risks and subsequent medical damages associated with Ingesting Plaintiff's Xarelto® use were the direct and proximate result of Defendants' conduct.

---

[16] http://www.drugwatch.coml20  13/07 123/blood-thinner-growth-more-risk

## FACTUAL ALLEGATIONS

99.     On or about January 5, 2013, Ingesting Plaintiff was first prescribed and began taking Xarelto® upon direction of Ingesting Plaintiff's physician for atrial fibrillation. Subsequently, as a direct result of Ingesting Plaintiff's ingestion of Xarelto®, Ingesting Plaintiff suffered severe vaginal bleeding "menorrhagia" and was admitted on February 7, 2013, overnight, to St. Joseph Regional Medical Center, in Mishawaka, Indiana.

100.    Ingesting Plaintiff was directed to OB/GYN for further evaluation of uncontrolled vaginal bleeding over a period of several months.  On June 26, 2013, Ingesting Plaintiff was admitted to Memorial Hospital of South Bend, in South Bend, IN undergoing an endometrial ablation in a continued effort to treat Plaintiff's excessive bleeding through cauterization.

101.    As a direct result of being prescribed Xarelto® for this period of time, Ingesting Plaintiff has suffered significant injuries, such as those described above.

102.    As a proximate result of Defendants' acts and omissions, Ingesting Plaintiff suffered the injuries described hereinabove due to Ingesting Plaintiff's ingestion of Xarelto®. Ingesting Plaintiff accordingly seeks damages associated with these injuries.

103.    Ingesting Plaintiff would not have used Xarelto® had Defendants properly disclosed the risks associated with its use.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATION

104.    Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

105.    The running of any statute of limitations has been tolled by reason of Defendants'

fraudulent concealment.  Defendants, through failing to disclose, for three years, the truth

about the safety and efficacy of Xarelto®, to Ingesting  Plaintiff's physicians  and/or

Ingesting  Plaintiff, and misrepresenting Xarelto® as safe and efficacious for its intended

use, actively concealed from said individuals the true risks associated with the use of

Xarelto® drug products.

106.    Ingesting Plaintiff had no knowledge that Defendants was engaged in the

wrongdoing alleged herein.   Because of the fraudulent acts of concealment of

wrongdoing by the Defendants, the Ingesting Plaintiff could not have reasonably

discovered the wrongdoing at any time prior to the commencement of this action.

107.    Neither Ingesting Plaintiff, nor Ingesting Plaintiff's physicians, could not have

reasonably, or possibly, determined the nature, extent and identity of related health risks

associated with Xarelto®.   Ingesting  Plaintiff and Ingesting Plaintiff's physicians

reasonably relied on Defendants to disseminate truthful and accurate safety and efficacy

information about its drug and warn of the side effects complained of herein.

108.    Furthermore, Defendants are estopped from relying on any statute of limitations

because of their fraudulent concealment of the defective nature of Xarelto®.   Defendants

were under a duty to disclose the true character, quality, and nature of Xarelto® because

this was non- public information over which the Defendants have, and continue to have,

exclusive control, and because Defendants knew this information was not available to the

Ingesting Plaintiff or their physicians.   In addition, the Defendants are estopped from

relying on any statute of limitations because of their concealment of these facts.

109.    WHEREFORE, Ingesting Plaintiff prays for judgment against Defendants, jointly

and severally, in an amount, which will compensate the Plaintiff for their injuries.

## COUNT I:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN AND DESIGN DEFECT

110.    Ingesting Plaintiff  incorporates by reference each and every paragraph  of this

Complaint as if fully set forth herein and further alleges as follows:

111.    At all times relevant and material hereto, Defendants were engaged in the

business of designing, manufacturing, testing, marketing, and placing into the stream of

commerce pharmaceuticals, including the Xarelto at issue in this lawsuit, for the sale to,

and use by, members of the public.   The  Xarelto® manufactured by  Defendants

reached  Ingesting  Plaintiff  without substantial  change and was ingested as directed.

The Xarelto® was defective and unreasonably dangerous when it entered into the stream

of commerce and when used by Ingesting Plaintiff.

112.    Defendants, as manufacturers  and distributers of pharmaceutical  drugs,  are

held to  the level of knowledge of an expert in the field, and further, Defendants knew or

should have known  that warnings  and  other clinically  relevant  information  and data

which they distributed regarding the risks of irreversible bleeds and other injuries and

death associated with the use of Xarelto® were inadequate.

113.    Ingesting Plaintiff did not have the same knowledge as Defendants and no

adequate warning or other clinically relevant information and data was communicated to

Ingesting Plaintiff or to Ingesting   Plaintiff's    treating physicians.

114.    Defendants   had  a  continuing   duty  to  provide   consumers,   including Ingesting Plaintiff,   and  Ingesting   Plaintiff's   physicians,   with   warnings and  other   clinically   relevant information   and data regarding   the risks and dangers  associated   with Xarelto®,  as it  became  or could have  become  available to Defendants.

115.    Defendants   marketed,  promoted,   distributed   and  sold  an unreasonably dangerous and defective   prescription drug, Xarelto®, to  health  care  providers empowered   to  prescribe   and dispense  Xarelto®   to consumers,   including Ingesting   Plaintiff,  without  adequate   warnings   and other   clinically   relevant information   and  data. Through   both  omission   and  affirmative misstatements,   Defendants   misled  the medical  community about the risk  and benefit  balance  of Xarelto®,  which  resulted  in injury to Ingesting  Plaintiff.

116.    Despite  the fact that Defendants  knew  or should  have  known  that Xarelto®  caused unreasonable   and dangerous  side effects, they continued  to promote  and market  Xarelto®  without stating  that there  existed  safer  and more or  equally  effective  alternative   drug products  and/or providing  adequate clinically  relevant  information  and data.

117.    Defendants   knew  or  should  have  known  that  consumers,   Ingesting Plaintiff specifically,   would   foreseeably and needlessly suffer injury  or death  as a result  of Defendants' failures.

118.   Defendants   failed   to   provide   timely   and   adequate   warnings   to physicians, pharmacies,   and consumers,   including   Ingesting   Plaintiff   and to Ingesting   Plaintiffs   intermediary physicians,   in the following   ways:

a)      Defendants    failed   to   include   adequate   warnings   and/or provide   adequate clinically   relevant   information   and data that would   alert Ingesting   Plaintiff   and Ingesting   Plaintiff's   physicians   to the dangerous risks   of Xarelto®   including, among   other things,   irreversible   bleeds;

b)      Defendants   failed   to provide   adequate   post-marketing warnings   and instructions after   the   Defendants   knew   or should   have known   of the significant   risks   of, among   other things,   irreversible   bleeds;

c)      Defendants   continued   to aggressively   promote   and sell Xarelto®,   even after they knew   or should   have   known   of the unreasonable risks   of irreversible   bleeds from   this   drug.

119.   Defendants   had an obligation   to provide   Ingesting   Plaintiff   and Ingesting Plaintiff's physicians   with   adequate   clinically   relevant   information   and data and   warnings   regarding   the adverse health   risks   associated   with   exposure   to Xarelto®,   and/or that there   existed   safer   and more or equally   effective   alternative drug products.

120.   By   failing   to   provide   Ingesting   Plaintiff   and Ingesting   Plaintiff's physicians   with adequate   clinically   relevant   information   and data and warnings   regarding   the   adverse   health risks   associated   with   exposure   to

Xarelto®, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

121.    Defendants'  actions described above were performed willfully, intentionally,  and with reckless disregard of the life and safety of the Ingesting Plaintiff and the general public.

122.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Ingesting Plaintiff was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

123.    As to **Count 1- Strict Products Liability**, Ingesting Plaintiff reserves its rights to amend this cause of action, or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT II:  NEGLIGENCE

124.    Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

125.    Defendants owed a duty to the general public, and specifically to the Ingesting Plaintiff, to exercise reasonable care in the design, study, development, manufacture, promotion, sale, marketing and distribution of their prescription medications, including the Xarelto® at issue in this lawsuit. Defendants failed to exercise reasonable care in the design of Xarelto® because as designed, Xarelto was capable of causing serious personal injuries such as those suffered by Ingesting Plaintiff during foreseeable use. Defendants also failed to exercise reasonable care in the marketing of Xarelto® because they failed to warn, that as designed, Xarelto® was

capable of causing serious personal injuries such as those suffered by Ingesting Plaintiff during foreseeable use.

126.   Defendants breached their duty and were negligent in , but not limited to, the following actions, misrepresentations,  and omissions toward Ingesting Plaintiff:

a)   Failing to use due care in developing, testing, designing, and manufacturing Xarelto® so as to avoid the aforementioned risks to individuals when Xarelto® was being used for treatment;

b)   Failing to accompany their product with proper or adequate warnings,  or labeling regarding  adverse side effects and health risks associated with the use of Xarelto® and the comparative severity and duration of such adverse effects;

c)   In disseminating  information to Ingesting Plaintiff and Ingesting  Plaintiffs physicians  that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Ingesting Plaintiff;

d)   Failing to accompany their products with proper or adequate rate of incidence or prevalence of irreversible bleeds;

e)   Failing to provide  warnings  or other information  that  accurately reflected the symptoms, scope, and severity of the side effects and health risks;

f)   Failing to conduct adequate pre-clinical and clinical testing and post- marketing surveillance to determine the safety of Xarelto®;

g)      Failing to warn Ingesting Plaintiff, the medical and healthcare community, and consumers that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Ingesting Plaintiff and other consumers;

h)      Failing to provide adequate training or information to medical care providers for appropriate use and handling of Xarelto® and patients taking Xarelto®;

i)      Failing to adequately test and/or warn about the use of Xarelto®, including, without limitations, the possible adverse side effects and health risks caused by the use of Xarelto®;

j)      Failing to design and/or manufacture a product that could be used safely due to the lack of a known reversal agent or antidote;

k)      In designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendant knew or should have known could cause injury to Ingesting Plaintiff;

l)      Failing to remove Xarelto® from the market when Defendants' knew or should have known of the likelihood of serious side effects and injury to its users;

m)      Failing to adequately warn users, consumers and physicians about the severity, scope and likelihood of bleeds and related dangerous conditions to individuals taking Xarelto®; and

30

n)      Representing  to physicians, including but not limited to Ingesting

Plaintiff's prescribing physicians, that this drug was safe and effective for use.

127.   The Xarelto® that injured Ingesting Plaintiff was in substantially the same

condition when Ingesting Plaintiff ingested it as it was in when it left the control of

Defendants. Defendants' Xarelto's®  ability  to  cause  serious  personal  injuries  and

damages,  such  as  those  suffered  by Ingesting  Plaintiff,  was not due to any voluntary

action  or contributory  negligence  of Ingesting Plaintiff.   Ingesting Plaintiff consumed

the Xarelto® as directed and without change in its form or substance.

128.   Defendants'  failure to exercise  reasonable  care in the design, dosing

information, marketing,  warnings,  and/or  manufacturing  of  Xarelto®  was  a

proximate  cause  of  Ingesting Plaintiffs  injuries and damages.

129.   Ingesting Plaintiff seeks all damages to which Plaintiff may be justly entitled.

130.   The Ingesting Plaintiff's   injuries and damages are severe and permanent, and

will continue into the future.  As a result, the Ingesting Plaintiff seeks actual and punitive

damages from the Defendants.

131.   As to Count II-Negligence,   Ingesting Plaintiff reserves its rights to amend this

cause of action or seek a court order to apply any applicable law of the Ingesting

Plaintiff's home state.

## COUNT  III:  NEGLIGENCE - FAILURE  TO WARN

132.   Ingesting  Plaintiff  incorporates  by reference  each  and  every paragraph of

this Complaint as if fully set forth herein and further alleges as follows:

133.    Xarelto® was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert patients and prescribing physicians of the dangerous risks and reactions associated with Xarelto®, including but not limited to the prevalence of irreversible bleeding, and other serious injuries and side effects despite the Defendant's knowledge of the increased risk of these injuries over other anticoagulation therapies available.

134.    Xarelto® was defective due to inadequate post-marketing warnings and instruction because Defendants knew or should have known of the risk and danger of serious bodily harm and or death from the use of Xarelto® but failed to provide an adequate warning to patients and prescribing physicians of the product, knowing the product could cause serious injury and or death.

135.    Ingesting Plaintiff was prescribed and used Xarelto® for its intended purpose.

136.    Ingesting Plaintiff could not have known about the dangers and hazards presented by Xarelto®.

137.    The warnings that were given by the Defendants were not accurate, clear, compete, and/or were ambiguous.

138.    The warnings, or lack thereof, that were given by the Defendants failed to properly warn prescribing physicians of the risk of irreversible bleeding and other serious injuries and side effects, and failed to instruct prescribing physicians to test and monitor for the presence of the injuries for which Plaintiff and others had been placed at risk.

139.    The warnings that were given by the Defendants failed to properly warn Ingesting Plaintiff and prescribing physicians of the prevalence of irreversible bleeds.

140.    The Ingesting Plaintiff, individually and through their prescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.   The Defendants had a continuing duty to warn the Ingesting Plaintiff and prescribing physicians of the dangers associated with Xarelto®.   Had Ingesting Plaintiff received adequate warnings regarding the risks of Xarelto®, they would not have used Xarelto®.

141.    As a direct and proximate result of Xarelto's®   defective and inappropriate warnings, Plaintiff has suffered severe physical injuries and damages as described above.

142.    As a direct and proximate result of the wrongful  acts of the Defendants, Ingesting Plaintiff suffered  severe and irreparable bodily injury; suffered  and will continue to suffer great pain of body and mind; suffered and will continue to suffer great embarrassment and humiliation; suffered and will continue to suffer permanent impairment to Ingesting  Plaintiffs'  earnings capacity; incurred and will continue to incur expenses for medical treatment of Ingesting  Plaintiffs' injuries; suffered and will continue to suffer the loss of enjoyment of life and have been otherwise damaged to be further shown by the evidence.

143.    For the above reasons, the Defendants are strictly liable under state law without regard to proof of negligence or gross negligence.

144.   As to Count III-Negligence- Failure to Warn, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT  IV: NEGLIGENCE  - UNREASONABLE   MARKETING  OF A DANGEROUS DRUG  AND  UNREASONABLE   FAILURE  TO REMOVE THE  DRUG  FROM  TH E MARKET

145.   Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

146.   Defendants owed a duty to the general public, and specifically to the Ingesting Plaintiff, to not introduce a drug into the market, or continue a previous tender of a drug, including the Xarelto® at issue  in this  lawsuit,   that was unreasonably dangerous for any person to use it and  was  capable  of  causing  serious  personal injuries such  as  those  suffered  by  Ingesting Plaintiff during foreseeable use.

147.   Defendants  breached their duty of care  and were negligent  by, but not limited to, the following actions, misrepresentations,  and omissions toward Ingesting Plaintiff:

   a)      Failing to exercise reasonable and ordinary care in that the drug Xarelto® was so unreasonably  dangerous and defective in design that it never should have been on the market or taken by anyone;

   b)      Failing to  exercise reasonable  and ordinary care  in the design,  research, development, manufacture, sale, testing and or distribution of the drug Xarelto®.

c)      Tendering into the market a drug which Defendants knew or should have known was so dangerous that it shouldn't have been taken by anyone.

d)      Violating its duty of care in design by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

e)      Violating its duty of care in design in marketing by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

f)      Violating its duty of care in design by placing an unsuitable product into the market for public consumption.

148.   The Xarelto® that injured Ingesting Plaintiff was in substantially the same condition when Ingesting Plaintiff ingested it as it was in when it left the control of Defendants.   Xarelto's® ability to cause serious personal injuries and damages such as those suffered by Ingesting Plaintiff was not due to any voluntary action or contributory negligence of Ingesting Plaintiff.   Ingesting Plaintiff consumed the Xarelto® as directed and without change in its form or substance.

149.   Defendants' violation of its duty of care resulted in an untenably dangerous product being placed into the marketplace which was a proximate cause of Ingesting Plaintiffs injuries and damages.

150.   Ingesting Plaintiff seeks all damages to which Ingesting Plaintiff may be justly entitled.

151.   The Ingesting   Plaintiffs   injuries  and damages  are severe and permanent, and will continue   into the future.   As a result, the Ingesting   Plaintiff seeks actual and punitive  damages   from the Defendants.

152.   As  to  Count IV- Negligence,  Unreasonable  Marketing  of a Dangerous  Drug and Unreasonable  Failure  to Remove the Drug from the Market, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court' order to apply any applicable law of the Ingesting Plaintiff's  home state.

## COUNT V: BREACH OF WARRANTY - BREACH OF EXPRESS WARRANTY

153.   Ingesting  Plaintiff  incorporates  by  reference  each  and  every  paragraph  of this Complaint as if fully set forth herein and further alleges as follows:

154.   Defendants  researched,  developed,  designed,  tested,  manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into  the  stream  of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, healthcare  professionals  and consumers,  including Ingesting  Plaintiff,  or persons  responsible  for consumer.

155.   Xarelto®  materially   failed  to  conform  to  those  representations  made by Defendants  in package  inserts,  and otherwise, concerning the properties  and effects of Xarelto®, respectively manufactured and/or distributed and sold by Defendants, and which Ingesting Plaintiff purchased  and  ingested  in  direct  or  indirect  reliance  upon these  express  representations. Such failures  by Defendants  constituted  a  material breach  of  express  warranties  made,  directly  or indirectly,  to Ingesting Plaintiff concerning Xarelto® sold to Ingesting Plaintiff.

156.    As a direct, foreseeable, and proximate result of Defendants' breaches of express warranties, Ingesting Plaintiff suffered grievous bodily injury and consequent economic and other loss, as described above, when Ingesting Plaintiffs physician, in reasonable reliance upon such express warranties, prescribed for Ingesting Plaintiff the use of Xarelto®.   Ingesting Plaintiff purchased and ingested Xarelto® as prescribed and instructed by Ingesting Plaintiff's physician, leading to Ingesting Plaintiff's injuries.

157.    The Ingesting Plaintiff's injuries and damages are severe and permanent, and will continue into the future. As a result, the Ingesting Plaintiff seeks actual and punitive damages from the Defendants.

158.    As to Count V- Breach of Warranty, Breach of Express Warranty, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiffs home state.

## COUNT VI: BREACH OF WARRANTY  - BREACH OF IMPLIED WARRANTY

159.    Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

160.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, health care professionals and consumers, including Ingesting Plaintiff, or persons responsible for consumer.

161.    Defendants impliedly warranted their Xarelto® product, which they manufactured and/or distributed and sold, and which Ingesting Plaintiff purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

162.    Defendants breached their implied warranties of the Xarelto® product sold to Ingesting Plaintiff because this product was not fit for its common, ordinary, and intended use.

163.    As a direct, foreseeable and proximate result of Defendants' breaches of implied warranties, Ingesting Plaintiff suffered grievous bodily injury and consequential economic and other losses, as described above, when Ingesting Plaintiff ingested Xarelto®, in reasonable reliance upon the implied warranties, leading to Ingesting Plaintiffs injuries.

164.    The Ingesting Plaintiff's injuries and damages are severe and permanent, and will continue into the future. As a result, the Ingesting Plaintiff seeks actual and punitive damages from the Defendants.

165.    As to Count VI- Breach of Warranty, Breach of Implied Warranty, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiffs home state.

## COUNT VII: FRAUDULENT CONCEALMENT

166.    Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

167.    Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Xarelto® described herein, owed a duty to provide accurate and complete information regarding these products.

168.    The Defendants knew or should have known, that Xarelto® was unreasonably dangerous and defective, and caused serious, at times fatal, irreversible bleeds.

169.    Despite their knowledge, the Defendants omitted material facts in the disclosures they made to the public, the medical community and to consumers, including the Ingesting Plaintiff and prescribing physicians, concerning the use and safety of Xarelto®.

170.    The Defendants made untrue, deceptive, and/or misleading representations of material facts, and omitted and/or concealed material facts from the public, including the Ingesting Plaintiff and prescribing physicians, concerning the use and safety of Xarelto®.

171.    The Defendants' practices relating to their promotion of Xarelto® created and/or reinforced a false impression as to its safety.

172.    The Defendants' practice of promoting Xarelto® placed and continues to place all consumers of Xarelto® at risk for serious injury resulting from its potentially lethal side effects.

173.    The Defendants' statements and omissions were made with the intent that the Plaintiff, and Plaintiffs prescribing physician, would rely on them.

174.    The Ingesting Plaintiff purchased and used Xarelto® for personal, family or household purposes and suffered ascertainable losses of money as a result of the Defendants' use or employment of the methods, acts, or practices.

175.    As a direct and proximate result of the Defendants' acts of fraud, the Ingesting Plaintiff suffered irreparable injuries.

176.    Ingesting Plaintiff endured substantial pain and suffering. As a result, the Ingesting Plaintiff has incurred significant expenses for medical care and will continue to be economically and emotionally harmed in the future.

177.    The Ingesting Plaintiff's injuries and damages are severe and permanent, and will continue into the future. As a result, the Ingesting Plaintiff seeks actual and punitive damages from the Defendants.

178.    As to Count VII-Fraudulent Concealment, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT VIII: VIOLATION OF CONSUMER PROTECTION LAWS

179.    Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

180.    Ingesting Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

181.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

> a)    Representing  that goods  or services  have  characteristics, ingredients,  uses benefits  or quantities  that  they  do not have;

> b)    Advertising  goods  or services  with  the intent  not to sell them as advertised; and

> c)    Engaging  in fraudulent  or deceptive  conduct  that  creates  a likelihood  of confusion  or misunderstanding.

182.    Defendants  violated  consumer  protection  laws through  their  use  of false and misleading  misrepresentations  or omissions  of material  fact relating  to the safety  of Xarelto®.

183.    Defendants  uniformly  communicated  the purported  benefits  of Xarelto® while failing  to disclose  the serious  and dangerous  side-effects  related  to the use  of Xarelto®  and of the true  state  of Xarelto®  regulatory  status,  its safety,  its efficacy, and its usefulness.  Defendants  made these  representations  to physicians,  the medical  community  at large,  and to patients  and consumers such as Ingesting Plaintiff  in the marketing  and advertising  campaign  described  herein.

184.    Defendants'  conduct  in connection  with  Xarelto®  was also  impermissible and illegal in that it created  a likelihood  of confusion  and misunderstanding,  because Defendant misleadingly,  falsely and or deceptively  misrepresented  and omitted numerous  material  facts regarding,  among  other  things,  the utility,  benefits,  costs, safety,  efficacy  and  advantages  of Xarelto®.

185.   As a result of these violations of consumer protection laws, Ingesting Plaintiff has incurred and will incur; serious physical injury, pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

186.   As to Count XIII-Violation of Consumer Protection Law, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT IX:  DAMAGES – COMPENSATORY AND PUNITIVE

187.   Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

188.   Ingesting Plaintiff is entitled to punitive damages because Defendants' actions were reckless and without regard for the public's safety.  Defendants mislead both the medical community and the public at large, including Ingesting Plaintiff and Ingesting Plaintiff's physicians, by making knowingly false representation about and concealing pertinent information regarding Xarelto®.  Defendants downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the use of Xarelto® despite information demonstration the product was unreasonably dangerous.

189.   Defendants failed to provide warnings that would have dissuaded health care professionals from using Xarelto®, thus preventing health care professionals and

42

consumers, including Plaintiff, from weighing the true risks against the benefits of using Xarelto®.

190.   Defendants failed to provide adequate training and instructions to physicians to prevent Xarelto® from causing serious harm and suffering to patients, including Plaintiff.

191.   As a proximate result of Defendants' acts and omissions, Ingesting Plaintiff suffered internal and gastrointestinal bleeding, all resulting from Ingesting Plaintiffs ingestion of Xarelto®.

192.   As a result of Ingesting Plaintiff's injuries, the Ingesting Plaintiff has endured substantial pain and suffering; has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

193.   Ingesting Plaintiff has suffered and will continue to suffer economic loss, and have otherwise been emotionally and economically injured.

194.   Defendants' actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

195.   Ingesting Plaintiffs injuries and damages are severe, permanent and will continue into the future.   As a result, Ingesting Plaintiff seeks actual and punitive damages from the Defendants.

196.   Defendants' conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including the Ingesting Plaintiff, thereby entitling the Ingesting Plaintiff to punitive damages in an

amount appropriate to punish the Defendants and deter them from similar conduct in the future.

197.  As to Count IX- Damages, Compensatory and Punitive, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## PRAYER FOR RELIEF

WHEREFORE,    Ingesting Plaintiff prays for relief against Defendants as follows:

A.  Awarding Plaintiff's past and future medical and incidental expenses, according to proof;

B.  Awarding Plaintiff's past and future loss of earnings and/or earning capacity, according to proof;

C.  Awarding Plaintiff's past and future general damages, according to proof;

D.  For compensatory damages according to proof, including pain, suffering and mental anguish;

E.  Awarding punitive and exemplary damages in an amount to be determined at trial;

F.  Awarding disbursements and expenses of this action, including reasonable counsel fees and other appropriate relief;

G.  Awarding prejudgment and post judgment interest; and

H.  Granting such other and further relief as is just and proper.

Dated: August 5, 2015

ELKUS SISSON & ROSENSTEIN, P.C.
Attorneys for Plaintiff

Scott D. McLeod, Esq., CO # 38564
501 South Cherry St., Ste. 920
Denver, CO 80246
Phone (303) 567-7981
Fax (303) 431-3753
(admitted Pro Hac Vice)
Attorneys for all Plaintiff

LEWIS LEGAL SERVICES P.C.
Additional Attorney for Plaintiff

ERIC C. LEWIS, ESQ., INBAR #28282-49
1060 East 86th Street
P.O. Box 40603
Indianapolis, IN 46240
Phone (317) 623-3030
Fax (317) 623-3062
Email: lewislegal@live.com

## DEMAND FOR JURY TRIAL

All Plaintiff(s) hereby demand a trial by jury as to all issues so triable.

ELKUS SISSON & ROSENSTEIN, P.C.
Attorneys for Plaintiff

Dated: August 5, 2015

Scott D. McLeod, Esq., CO # 38564
501 South Cherry St., Ste. 920
Denver, CO 80246
Phone (303) 567-7981
Fax (303) 431-3753
(Admitted Pro Hac Vice)

LEWIS LEGAL SERVICES P.C.
Additional Attorney for Plaintiff

45

ERIC C. LEWIS, ESQ., INBAR #28282-49
1060 East 86th Street
P.O. Box 40603
Indianapolis, IN 46240
Phone (317) 623-3030
Fax (317) 623-3062
Email: lewislegal@live.com